# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHARON KONSPORE,                          :
                                          :
                    Plaintiff,            :
                                          :
v.                                        :        No. 3:10cv613 (MRK)
                                          :
FRIENDS OF ANIMALS, INC.,                 :
                                          :
                    Defendant.            :


## MEMORANDUM OF DECISION

Plaintiff Sharon Konspore's Amended Complaint [doc. # 22] alleges that her former employer, Friends of Animals, Inc. ("FoA"), unlawfully fired her. More specifically, Ms. Konspore alleges that her termination was due to discrimination on the basis of Ms. Konspore's Chronic Lyme Disease,[1] in violation of the Americans with Disabilities Act as Amended, 42 U.S.C. §§ 12101-17 ("ADA"), and in violation of the provisions of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-51 *et seq.*; and in illegal retaliation for her exercise of free speech, in violation of the Connecticut Whistleblower Statute, Conn. Gen. Stat. § 31-51m, and in violation of Conn. Gen. Stat. § 31-51q. Pending before the Court is FoA's Motion for Summary Judgment [doc. # 48].

Because Ms. Konspore fails to establish a *prima facie* case of discrimination based on disability, the Court dismisses her ADA and CFEPA claims. Although Ms. Konspore does state a

---

[1] Lyme disease is an infection that ordinarily responds well to conventional antibiotic therapy. *See* Henry M. Feder, Jr., *et al.*, *A Critical Appraisal of "Chronic Lyme Disease*," 357 New Eng. J. Med. 1422, 1422 (2007). The diagnosis of "chronic Lyme disease" is controversial among medical specialists. *See id.*; *see also Parker v. Vulcan Material Co. Long Term Disability Plan*, 670 F. Supp. 2d 983, 998-99 (C.D. Cal. 2009) (discussing the controversy in the context of a disability benefits dispute), *rev'd on other grounds*, 413 F. App'x 987 (9th Cir. 2011).

*prima facie* case of retaliation under § 31-51q, as Ms. Konspore does not offer any evidence that FoA's legitimate business reason for her termination was merely pretextual, her § 31-51q claim also fails. Lastly, the Court declines to exercise supplemental jurisdiction over her § 31-51m claim.

## I.

These facts are culled from the parties' Local Rule 56(a) Statements [docs. # 48-2, 54-1], affidavits, and exhibits. All of the facts recited below are undisputed unless otherwise noted, and the Court presents all facts "in the light most favorable to the nonmoving party"—here, Ms. Konspore—after drawing "all reasonable inferences in [her] favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000) (quotation marks omitted). Additional facts are discussed in the analysis where relevant.

FoA is a non-profit international animal advocacy organization with 18 employees. Priscilla Feral is FoA's President, Dianne Forthman is FoA's Vice President, and Robert Orabona is FoA's Operations Director. Ms. Feral and Mr. Orabona are married. From May 28, 2008 through November 3, 2009, Sharon Konspore was FoA's Controller/Accountant. Dr. Albert Campo is Ms. Konspore's primary physician, though she has also been treated by Dr. Gerald Weiss and Dr. Mindy Beth Lipson.

When Ms. Konspore interviewed for her job at FoA, she informed Ms. Forthman that she had Lyme Disease. Ms. Forthman shared this information with Ms. Feral. Ms. Konspore was hired on May 28, 2008 as FoA's only accountant, and at least by the end of 2008, everybody at FoA knew that Ms. Konspore had Lyme Disease. FoA currently employs an individual who has Lyme Disease, and this individual was employed by FoA for the entirety of Ms. Konspore's employment.

2

FoA met many of Ms. Konspore's health-related requests, including allowing a nurse to come into the office to change Ms. Konspore's bandages and reducing fumes from publications. For approximately a week around August 5, 2009, Ms. Konspore was allowed to alter her work hours to arrive an hour earlier than scheduled and leave an hour earlier than scheduled for a short period of time. However, although she noted that the accommodation was health-related, Ms. Feral terminated it "so that key administrative people are reachable by me and others when we're open for business. . . . Something always seems to pop in the late afternoon. This summer, one is unable to reach you and several others a couple of hours or more each day . . . ." Pl. Resp. [doc. # 56] Ex. 14 (Feral E-mail). According to Ms. Feral, a person could work a modified schedule only if a special exception applied. For two employees, the special exception was their long commute, for a third, it was because she had negotiated for a modified schedule when she was hired.

In December 2008, FoA discussed laying off an employee who was suffering from Parkinson's Disease. Ms. Forthman's meeting notes states: "Sandy – disability LT – layoff?" Pl.'s Resp. [doc. # 56] Ex. 7 (Forthman Notes). Ms. Forthman stated in her deposition that she recalled asking Mr. Orabona whether the employee should be offered long term disability after her layoff, but she could not recall Mr. Orabona's response and admitted that she did not know how such benefits worked. Ms. Forthman also stated that she had never made such an inquiry prior to that meeting, after it, or with regard to Ms. Konspore.

In 2009, growing increasingly concerned about its financial health, FoA laid off employees in January and March 2009. On March 13, 2009, Ms. Konspore attended a meeting, along with Ms. Feral, Mr. Orabona, and Ms. Forthman, in which she alleges that Ms. Feral cited two employees' health conditions in the context of a discussion about discharging them. *See*

Def.'s Mot. for Summ. J. [doc. # 48-6] Ex. 4 at 21 (Konspore Dep.) (stating that Vernon Ware's heart condition and Jill Harrington's upcoming surgery were discussed at the layoff meeting as reasons for their termination). Ms. Konspore stated that she had responded to this discussion by saying "'You can't say you're letting them go. You need to tell them it's because of lack of work and the economy.'" *Id.* Ms. Konspore noted that no one voiced concern about disability being a reason for these two people potentially losing their jobs. Afterwards, Ms. Konspore claims to have told Ms. Forthman, "'I'm very concerned I will be next.'" *Id.* at 22. Ms. Konspore maintains that her statements in and after the meeting constitute complaints regarding how people with disabilities should be treated. *See id.* at 33 ("I made it very clear that it was a liability and it was wrong for them to terminate people due to medical or their disabilities or whatever, and that you should be sure it doesn't leave this room, and you say we either are cutting back due to the economy or there's a lack of work."). The other attendees state that they never made a termination decision based on an employee's health condition or disability in any way.

Ms. Forthman's notes from the meeting include both of those employee's names, followed by cross-outs, and the word "layoff." *See* Pl.'s Resp. [doc. # 56] Ex. 7 (Forthman Notes). At her deposition, Ms. Forthman could not recall or decipher at the deposition what the cross-out stated. Both Mr. Ware and Ms. Harrington were laid off.

On March 14, 2009, Ms. Konspore sent an e-mail to Connecticut's Attorney General, Richard Blumenthal, critiquing many of FoA's financial practices and policies. She made no mention of discrimination based on disability.

On March 31, 2009, Ms. Forthman wrote a memorandum to Ms. Feral, stating that FoA was in danger of running out of money by November or December 2009. Ms. Forthman maintains that she wrote the memorandum to draw attention to the direness of FoA's financial

situation.

FoA maintains that Ms. Feral, in conjunction with Mr. Orabona and Ms. Forthman, created a plan that would commence in May 2009 and would cut FoA's budget by $2 million; Ms. Konspore denies this, but doesn't specify to what she objects or provide citations to the record. Both parties agree that FoA intended to and implemented cuts to life insurance for all employees, including Ms. Feral and Mr. Orabona.

On April 16, 2009, Ms. Konspore wrote an e-mail to Ms. Forthman, copying Mr. Orabona, entitled "Insurance." Ms. Konspore's e-mail stated that if the company canceled the insurance on the company car, a BMW, and sold the car for its blue book value, FoA would be able to use the proceeds to afford life and disability insurance for its employees. Ms. Konspore also stated that FoA's New York office was a waste of the donor's funds and should be closed. Ms. Konspore repeatedly noted that she was motivated to write the e-mail because she felt compelled to act in the donors' best interest and that she was extremely worried for the short- and long-term health of the organization. Mr. Orabona responded that the BMW and insurance were part of Ms. Feral's compensation and that it didn't make sense to address it as a potential cut until Ms. Feral's compensation was reviewed, which was supposed to occur in the near future. He also noted that the costs of getting out of the five-year New York lease might exceed the benefits of keeping it and that FoA could reduce its insurance costs by requiring employees to pay a portion of the premium, as many other non-profits did.

Mr. Orabona then informed Ms. Feral of the contents of the e-mail. Ms. Feral became upset, and in a conference call later that day upbraided Ms. Konspore harshly. During the conversation, Ms. Feral repeatedly swore at Ms. Konspore, asked if she was trying to incriminate someone, ordered her to never put such thoughts in writing, and told her that she would be fired

if she ever did something like that again. Ms. Konspore recalls Ms. Feral noting that she got "latitude" because of her disability. *See* Def.'s Mot. for Summ. J. [doc. # 48-6] Ex. 4 at 29 (Konspore Dep.). Ms. Feral later instructed Mr. Orabona and Ms. Forthman that Ms. Konspore was not to send out any memoranda without approval from them.

In early fall 2009, Ms. Konspore advised Mr. Orabona that, because of her Lyme Disease, she would need to go on disability leave. She had previously been provided with the necessary paperwork.

On October 1, 2009, Dr. Campo completed a Disability Claim Form, in which he stated that Ms. Konspore "should not be in stressful situations; should not deal with complex tasks requiring full cognitive skills. . . . Cannot perform tasks requiring normal level of ability to concentrate and highly integrative functions." Def.'s Mot. for Summ. J. [doc. # 49-7] Ex. 20 (Campo Disability Claim Form). The parties disagree as to whether Dr. Campo believed that Ms. Konspore would have been able to work with reasonable accommodations.

On October 5, 2009, Ms. Feral wrote an e-mail to Ms. Forthman and Mr. Orabona asking when Ms. Konspore was going on disability leave and stating that it was time to begin a search for an accountant. At her deposition, Ms. Feral maintained that, although she hoped Ms. Konspore would return, she was planning for the worst case scenario so that FoA wouldn't be left without an accountant should Ms. Konspore fail to return.

In the employee section of the Disability Claim Form, Ms. Konspore indicated October 10, 2009 as the date on which she was first unable to work due to her medical condition.

On October 12, 2009, Ms. Konspore began her disability leave. Upon her departure, Mr. Orabona allegedly stated that he was not concerned if Ms. Konspore was out more than one month, as they had gone longer without financials. Ms. Konspore drafted a memo of which co-

workers would be responsible for some of her duties during her absence.

Some of Ms. Konspore's duties were absorbed during her absence by co-workers, including Ms. Forthman. FoA states that none of the individuals filling in for Ms. Konspore were trained as accountants and could not perform certain accounting duties, including making journal entries, bank reconciliation, and analyses. Ms. Forthman stated that her fundraising duties fell behind as a result of covering Ms. Konspore's former responsibilities, and Ms. Feral testified that she was aware that Ms. Konspore's absence was placing a strain on the organization. Ms. Konspore denies these facts, but does not explain or provide citations to the record regarding the reasons for her denials. Ms. Konspore testified at her deposition that, when she called to check on how things were at the office, the employee with whom she spoke insisted on calling her back on her cell phone because Ms. Feral had threatened to fire anyone who spoke with Ms. Konspore while she was out on disability.

FoA received paperwork related to an application for benefits by Ms. Konspore from Unum, its short-term disability insurer. On October 9, 2009, Mr. Orabona checked "Yes" in response to the question "If the employee/individual is released to return-to-work in restricted duty, are you willing to discuss accommodations?" Pl.'s Resp. [doc. # 56] Ex. 15 (Unum Form).

On October 23, Ms. Forthman spoke with Ms. Konspore, who stated she was having some good days and some bad ones. Ms. Konspore maintains that, had she been asked, she would have helped out in any way she could, but her citation to a letter to the Attorney General offers only minimal support for this claim. In an e-mail sent on October 26, 2009, Ms. Forthman noted that Ms. Konspore had said that she hoped to be back at work, perhaps after a month, even if part-time. Ms. Konspore denies making this statement.

On October 23, 2009, Mr. Orabona called the Connecticut Department of Labor and

FoA's insurance broker to ask if FoA was required to hold open a position for a person on disability. Both entities replied that FoA did not have to retain such employees. In his deposition, Mr. Orabona stated that he made this call because of discussions within the previous week of replacing Ms. Konspore.

On October 26, at Ms. Feral's direction, Mr. Orabona and Ms. Forthman called Ms. Konspore to discuss her possible return to work. However, Ms. Konspore states that there was no "discussion"—rather, Mr. Orabona simply repeated that FoA needed a full-time accountant. Ms. Konspore does not deny that FoA would have been willing to have her return as a full-time accountant. During this call, Mr. Orabona asked if Ms. Konspore would be able to return to work by November 2, 2009 and stated that, if not, FoA would need to begin a search for a new accountant. Ms. Konspore replied that she wasn't sure when she could return to work, but that she had a scheduled doctor's appointment on November 2, 2009 and requested she be allowed to inform FoA whether she would be able to return on November 3, 2009. Mr. Orabona stated that a November 3, 2009 update was acceptable and that Ms. Konspore should either return to work on that date or call to advise FoA if she could not return. FoA believed that Ms. Konspore understood that she was to come back to work or she would lose her job; Ms. Konspore states that she understood that she was to come back to work in full-time capacity or not at all.

Ms. Konspore did not return to work on November 3, 2009. Instead, on that date, FoA received a fax from Ms. Konspore's attorney stating that Ms. Konspore had filed a complaint with the Attorney General's Office and that Ms. Konspore was still in the process of evaluating her treatment options. The letter also requested an extension until November 20, 2009 of the deadline for notifying FoA of Ms. Konspore's ability to return to work in a full-time capacity. No

representations were made regarding a return-to-work date.

FoA responded that it could no longer hold Ms. Konspore's position open; Ms. Konspore's employment was then terminated effective November 3, 2009. According to Ms. Konspore, there was no discussion prior to her termination as to whether she could return to work on restricted duty; nobody called her when things were allegedly falling behind to see if she was available to help; nobody considered what duties could be fulfilled remotely or part-time; nobody considered the possibility of hiring a temporary accountant to handle some of Ms. Konspore's job functions; and there was no discussion as to any accommodation that could possibly allow her to return to her position.

On November 6, 2009, in a letter to Unum, Dr. Campo stated that Ms. Konspore "[c]annot be in situations that are stressful. Cannot work full day schedule or part time schedule; cannot concentrate, focus." Def.'s Mot. for Summ. J. [doc. # 49-16] Ex. 29 (Campo Letter).

On December 3, 2009, Dr. Lipson reported to Unum that Ms. Konspore's "ability to think clearly and focus on tasks has been [a]ffected as the Lyme is impacting her cognitive functioning." Def.'s Mot. for Summ. J. [doc. # 49-17] Ex. 31 (Lipson Letter). Furthermore, her symptoms were causing her "grave difficulty in coping with day to day activities. More interactive activity like working would be too difficult at present." *Id.* Dr. Lipson did state that, with treatment, Ms. Konspore would likely be able to return to work. *See id.*

Dr. Campo submitted an addendum to Unum on February 12, 2010 stating in part that Ms. Konspore's inability to return to work was primarily due to cognitive difficulties. Dr. Weiss also wrote a February 12, 2010 letter to Unum stating that Ms. Konspore's "biggest complaint has been her cognitive skills. . . . [She] was very concerned about her ability to keep numbers, fact[s] and contract details clear . . . ." Def.'s Mot. for Summ. J. [doc. # 49-18] Ex. 32 (Weiss

Letter). The letter noted that she remained "currently disabled from [working in] any competitive work environment requiring a level of functioning even remotely compatible with that which was required for her prior occupation." *Id.*

In his deposition, Dr. Campo stated that Ms. Konspore was not ready to go back to work as of May 7, 2010. He later stated that he didn't believe that she was able to return to work, even on a part-time basis, as of June 4, 2010, although he qualified his statement by noting that it was hard for him so say "with a high degree of certainty or with a certainty that she is able to tolerate an eight-hour day or not." *See* Def.'s Mot. for Summ J. [doc. # 49-8] Ex. 21 at 22 (Campo Dep.).

In the Physician's Certification of Claimant's Health, which supported Ms. Konspore's application for unemployment compensation benefits in 2010, Dr. Campo stated that Ms. Konspore became available to work on June 1, 2010. Ms. Konspore began receiving unemployment benefits on June 19, 2010.

On December 1, 2009, Ms. Konspore filed an Affidavit of Illegal Discriminatory Practice with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). By letter dated February 12, 2010, CHRO issued Ms. Konspore a Notice of Right to Sue, and by letter dated February 22, 2010, CHRO issued Ms. Konspore a Release of Jurisdiction.

At oral argument, Ms. Konspore's counsel offered into evidence a letter from Unum, dated December 15, 2009, denying Ms. Konspore full-time disability benefits based on its finding that Ms. Konspore was not prevented from working, even without reasonable accommodations, beyond November 10, 2009. The basis for Unum's conclusion was that Ms. Konspore's clinical exam findings did not preclude her from sedentary activities and the lack of records or testing indicating cognitive impairment.

Prior to November 2009, FoA had hired a temporary accountant after the departure of a

full-time accountant, and in the organization's history, at least one week went by with no accountant at all. Prior to November 2009, FoA had never hired a part-time accountant, nor had it permitted any accountant to work remotely. Ms. Konspore denies the latter statement, but does not offer an explanation or a citation to the record for her denial.

## II.

This Court applies a familiar standard when resolving a motion for summary judgment. Summary judgment is appropriate only when the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" submitted to the Court "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Civ. P. 56(a). A "material fact" is one whose resolution will affect the ultimate determination of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" when the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *See id.*; *see also Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub*, 202 F.3d at 178 (quotation marks omitted). However, the party against whom summary judgment is sought cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts," and instead "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986) (quotation marks omitted) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The Court notes that the Second Circuit has cautioned that district courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and quotation marks omitted). However, even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id.* "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quotation marks omitted).

Here, while the parties dispute numerous minor or collateral facts, summary judgment on Ms. Konspore's claims is appropriate because there are no genuine issues of material fact. *See Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005).

## III.

The ADA prohibits discrimination in employment against any "qualified individual on the basis of disability in regard to . . . [the] discharge of employees." 42 U.S.C. § 12112(a). Claims of intentional discrimination in employment under the ADA are analyzed under a version of the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for claims of employment discrimination under Title VII of the Civil Rights Act of 1964. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). A plaintiff must establish a *prima facie* case; the employer may then come forward with a legitimate, non-discriminatory reason for the termination; then the plaintiff has an opportunity to produce

evidence and carry the burden of persuasion that the proffered reason is a pretext and that the real reason for the termination was the plaintiff's membership in a protected class. *See id.* "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (alteration and quotation marks omitted). "The ultimate question is whether the employer intentionally discriminated, and . . . it is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147 (alteration and quotation marks omitted) (emphasis in original). As Connecticut looks to federal employment discrimination law in enforcing its antidiscrimination statute, Ms. Konspore's CFEPA claim stands or falls with her ADA claim. *See Colby v. Pye & Hogan LLC*, 602 F. Supp. 2d 365, 370 n.4 (D. Conn. 2009) (citing *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103 (1996)).

To establish a *prima facie* case of disability discrimination, a plaintiff must prove that: (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA; (3) the plaintiff was otherwise able to perform the essential functions of his job, with or without accommodation; and (4) the plaintiff suffered an adverse employment action because of the disability. *See, e.g.*, *Sista*, 445 F.3d at 169. A plaintiff's burden in establishing a *prima facie* case of discrimination under the *McDonnell Douglas Corp.* standard is *de minimis. Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998).

The parties do not contest that FoA was an employer within the meaning of the ADA. *See* 42 U.S.C. § 12111(5)(A). Nor do they disagree as to whether Ms. Konspore was disabled within the meaning of the ADA. *See* 42 U.S.C. § 12102(1) (noting that a person is disabled within the

13

meaning of the ADA if he or she has (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such an impairment"; or (3) is "regarded as having such an impairment"); 42 U.S.C. § 12102(2) ("[M]ajor life activities include, but are not limited to, . . . concentrating, thinking, communicating, and working.").

The crux of this motion is the third element of the *prima facie* case—that Ms. Konspore was otherwise able to perform the essential functions of her job, with or without an accommodation. After the essential functions of a FoA Accountant/Controller are established, Ms. Konspore must demonstrate that she could have performed all such functions, with or without a reasonable accommodation, at the time of her termination. *See D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998). This burden is not heavy: "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995). As relevant here, "reasonable accommodations" may include adjustments to work schedules or other job restructuring. *See* 45 C.F.R. § 84.12(b). Furthermore, apparently neutral rules cannot be used to trump requests for reasonable accommodations; "[w]ere that not so, the 'reasonable accommodation' provision could not accomplish its intended objective." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002). However, "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003). If Ms. Konspore demonstrates that certain accommodations would have allowed her to perform the essential functions, the burden of proof shifts to FoA to demonstrate that such accommodations would constitute undue hardships and would therefore be unreasonable. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008) (quoting 42 U.S.C. § 12182(b)(2)(A)(iii)).

A.

"EEOC regulations define 'essential functions' to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Rodal v. Anaesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004) (quotation marks omitted). Although a court must give considerable deference to an employer's judgment regarding what functions are essential for a particular position, the question of whether a function is essential ultimately depends on the totality of the circumstances. *See id.*; *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (stating that the relevant factors include the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the consequences of not requiring the employee to perform the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar jobs (citing 29 C.F.R. § 1630.2(n))).

In her amended complaint, Ms. Konspore states that her job duties included, but were not limited to, "(a) initiating and performing all finance and accounting functions, (b) developing financial statements for internal and external purposes, (c) financial planning and analysis, and (d) managing the processes for general ledger accounting functions, payables and receivables, cash flow, budgeting, forecasting, payroll, 401k, and petty cash related processes." Am. Compl. [doc. # 22] ¶ 20. Ms. Konspore clarifies that many of the job functions described in her complaint, as well as other more specific tasks, were not expected of FoA's accountant when she took the position. Both parties agree that Ms. Konspore worked over forty hours per week.

The parties disagree as to whether full-time work was one of the essential functions of the Accountant/Controller position. FoA claims that it needed a full-time accountant, noting that it

had never previously hired one on a part-time basis. Ms. Konspore maintains that it would not be necessary to work forty hours per week to complete the duties expected of FoA's accountant when she took the position. However, Ms. Konspore stated in her deposition that she worked over forty hours a week because previous accountants hadn't complied with Generally Accepted Accounting Principles and because her "contract is to get a job done and *whatever I need to do to get the job done is what I do*." Def.'s Mot. for Summ. J. [doc. # 48-6] Ex. 4 at 15, 41 (Konspore Dep.) (emphasis added).

Given Ms. Konspore's statements, a reasonable juror would conclude that working full-time was an essential function of the position. Ms. Konspore's argument amounts to a claim that if she were allowed to be less thorough, the job could be done in 20 rather than 40+ hours per week, but that is essentially an impermissible argument for the elimination of some of the job's essential functions. It is irrelevant that prior accountants did less work; that may well be directly related to the fact that they are no longer with the organization.

Whether working at the office, as opposed to at home, is an essential function of the job is more of an open question. FoA claims that it needed its accountant to be in the office and notes that it had never previously allowed an accountant to work remotely. Ms. Feral's letter to Ms. Konspore terminating her modified work schedule evinces FoA's interest in having "key administrative people . . . reachable by me and others when we're open for business. . . . Something always seems to pop in the late afternoon. . . ." Pl. Resp. [doc. # 56] Ex. 14 (Feral E-mail). Ms. Konspore counters that the essential functions of her position could have been completed just as effectively from home, and in her deposition, she describes the seemingly minimal accommodations and modifications FoA would need to fund to allow her to work from home. Finally, FoA never explicitly argues that her position required Ms. Konspore to be in the

office, either for communicative or supervisory reasons. On these facts, a reasonable juror could find that working at the office is not an essential function of the position. *See Rodal*, 369 F.3d at 120; *Stone*, 118 F.3d at 97.

B.

The Court next turns to the question of whether Ms. Konspore has demonstrated that she could perform all essential functions with a reasonable accommodation. *See D'Amico*, 132 F.3d at 151.

In her Amended Complaint, Ms. Konspore states only that she "is an individual who, with reasonable accommodation, was capable of performing the essential functions of the position of controller within Defendant's company." Am. Compl. [doc. # 22] ¶ 45. In her briefing on this motion, Ms. Konspore makes only vague references to "requests for accommodation." Pl.'s Resp. [doc. # 54] at 25. Nowhere does Ms. Konspore explicitly identify what reasonable accommodations would have allowed her to perform the essential functions of her position. The Court could therefore find that Ms. Konspore has failed to carry even the light burden of production. *See Borkowski*, 63 F.3d at 138; *Querry v. Messar*, 14 F. Supp. 2d 437, 444 (S.D.N.Y. 1998) ("The problem with Querry's position is that she has not suggested a plausible accommodation for her disability. . . . [H]er complaint does not suggest such an accommodation, which is grounds in itself for dismissing her claim. Nor does Querry suggest such accommodation elsewhere in her papers." (citations omitted)).

The Court has identified allusions to three potential reasonable accommodations FOA might have provided: (1) allowing Ms. Konspore to work part-time; (2) allowing Ms. Konspore

17

to work from home[2]; and (3) granting Ms. Konspore extended disability leave, possibly while hiring a temporary accountant to fulfill her duties in her absence.[3] *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 217 (2d Cir. 2001) ("The ADA defines 'reasonable accommodation' as including but not limited to 'job restructuring [and] part-time or modified work schedules . . . .'" (quoting 42 U.S.C. § 12111(9)(B)) (alterations omitted)).

## 1.

"Although part-time work constitutes a reasonable accommodation under the ADA, an employee who proposes this accommodation may only prevail in an ADA action if he can demonstrate that he could perform the essential functions of his job while working part-time." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 336 n.5 (2d Cir. 2000). There is some question as to whether Ms. Konspore was capable of performing the essential functions of her position—even with this accommodation—at the time she was terminated,[4] as Ms. Konspore and her doctor make numerous statements which imply that she would not have been able to

---

[2] In her interrogatory answers, Ms. Konspore states that on or around September 2009 she requested that she be allowed to work from home or remotely.

[3] At oral argument, Ms. Konspore's counsel stated that the three requested accommodations were to go on short term disability, to return to work part-time, and to return to work on a modified 8:00-4:00 (as opposed to 9:00-5:00) schedule. The Court addresses the effectiveness of the first two suggested accommodations in its analysis, but it finds that there is no evidence that Ms. Konspore requested a modified schedule after she went on disability leave. Although she had requested and received a work schedule modification earlier in her employment at FoA, it had been terminated—because Ms. Konspore was needed in the office during business hours—and Ms. Konspore has not offered evidence that she later requested it again. Nor does Ms. Konspore offer any evidence that she would have been able to return to work full-time on November 3, 2009 with such a modified schedule.

[4] On this point, Ms. Konspore's counsel offered into evidence at oral argument a letter from Unum dated December 15, 2009 denying Ms. Konspore full-time disability benefits based on its finding that Ms. Konspore was not prevented from working, even without reasonable accommodations, as of November 10, 2009. FoA correctly noted that this letter is not relevant to the question of whether Ms. Konspore was unable to work as of November 3, 2009.

complete the usual duties of an accountant at the time of her termination.[5]

On a disability claim form dated October 8, 2009, Ms. Konspore lists her symptoms, which include "Forgetfulness, memory loss (short or long term)," "Attention deficit problems, distractibility," "Confusion, difficulty thinking," "Difficulty with concentration, reading, spelling," "Cognitive Impairment," "Difficulty with multitasking," "Difficulty with organization and planning," "Word finding problems," and "Slowed speed of processing." Def.'s Mot. for Summ J. [doc. # 49-9] Ex. 22 (Konspore Disability Claim Form). Ms. Konspore has provided no explanation regarding these factual claims, many of which appear incompatible with her ability to fulfill essential requirements of her position.

---

[5] FoA maintains that, because Ms. Konspore and her doctors made representations to Unum that she was unable to work, she is estopped from asserted an ADA claim. The Supreme Court rejected this automatic estoppel argument in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), recognizing that "seemingly divergent" ADA claims and claims for disability insurance "are often consistent, each with the other," because the former take into account the possibility of reasonable accommodations. *Id.* at 797, 802-03. Instead, "pursuit, and receipt, of [disability] benefits does not *automatically* estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA." *Id.* at 797-98 (emphasis added). To survive a motion for summary judgment, a plaintiff who receives disability benefits need only "explain why [a statement made for the purpose of receiving disability benefits] is consistent with her ADA claim that she could perform the essential functions of her previous job, at least with reasonable accommodation." *Id.* at 798 (quotation marks omitted). Only if a plaintiff fails to resolve inconsistencies is he or she estopped from asserting an ADA claim.

While Ms. Konspore does fail to resolve the inconsistencies between her and her doctor's statements in support of her application for disability benefits, *Cleveland* still does not estop her ADA claim. *Cleveland*'s holding applies explicitly to those plaintiffs who receive disability benefits. *See Cleveland*, 526 U.S. at 802 ("The case before us concerns an ADA plaintiff who both applied for, *and received*, [disability] benefits." (emphasis added)); *see also Parker*, 204 F.3d at 335 n.3 (noting that because plaintiff's social security disability benefits had been denied, he received no benefit from statements made in his application for the benefits and therefore was not estopped from bringing an ADA claim). As Unum denied Ms. Konspore disability benefits, the Court does not find that *Cleveland* estops Ms. Konspore's ADA claim against FoA. The Court may nonetheless consider Ms. Konspore's and her doctor's statements in their applications—and her lack of an explanation for the inconsistencies between such statements and her Complaint—as relevant facts.

Similarly, Ms. Konspore never clarifies how her doctor's November 6, 2009 statement that Ms. Konspore "[c]annot be in situations that are stressful. *Cannot work full day schedule or part time schedule*; cannot concentrate, focus" can be reconciled with her claim that she could have returned to work on a part-time basis on November 3, 2009. Def.'s Mot. for Summ. J. [doc. # 49-16] Ex. 29 (Campo Letter) (emphasis added); *cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802 (1999) (stating that its holding may not apply to "directly conflicting statements about purely factual matters, such as 'The light was red/green,' or 'I can/cannot raise my arm above my head.'"); *Parker*, 204 F.3d at 333-34 (noting that the Second Circuit has affirmed summary judgment when the plaintiff provided directly contradictory statements in his ADA and disability insurance claims). Based on Ms. Konspore's and Dr. Campo's statements, and Ms. Konspore's failure to explain them, no reasonable juror could find that Ms. Konspore could fulfill the essential functions of her position on a part-time basis at the time of her termination.

Additionally, as full-time work was itself an essential function of the position, no reasonable juror could find that the essential functions of the job could have been completed on a part-time schedule. This is not a case of an apparently neutral rule—a requirement of attendance—merely being used to trump a request for a reasonable accommodation, *see U.S. Airways, Inc.*, 535 U.S. at 397; for the reasons discussed in Part A of this section, Ms. Konspore's position required full-time work, and an accommodation that eliminates an essential function is not reasonable.

### 2.

There remains the question of whether, if she were allowed to work from home, Ms. Konspore could have performed the essential functions of her job. On this question, case law varies dramatically, highlighting the fact-dependence of this evaluation.

The Second Circuit has implied that working from home might, in some cases, constitute a reasonable accommodation. *See Nixon-Tinkelman v. New York City Dept. of Health & Mental Hygiene*, 434 F. App'x 17, 20 (2d Cir. 2011) (summary order) (remanding to the district court to, *inter alia*, consider whether it would have been reasonable for the defendants to have allowed plaintiff to work from home); *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 104 (2d Cir. 2010) (suggesting that employer had provided a reasonable accommodation by allowing employee to work from home); *Parker*, 204 F.3d at 338 (remanding case for determination "of whether the accommodation of part-time work would have resulted in undue hardship").

Courts nonetheless often find that requests to work from home are unreasonable. *See Smith-Henze v. Edwin Gould Serv. for Children & Families*, No. 06 Civ. 3049 (LBS), 2008 WL 4937555, at *4 (S.D.N.Y. Nov. 19, 2008) ("Courts have generally held that it is generally not reasonable to require an employer to accommodate a request to work outside the workplace, where there is no supervision by superiors or interaction with coworkers.") (citing cases); *Lalla v. Consol. Edison Co. of New York*, No. 00-CV-6260 HB, 2001 WL 456248, at *4 (S.D.N.Y. Apr. 30, 2001) (stating that case law suggests that working at home "is an extraordinary accommodation, and is warranted in only exceptional cases"), *aff'd* 91 F. App'x 701 (2d Cir. 2002) (summary order).

The Court need not determine whether working from home, in the abstract, is a reasonable accommodation in this case, as in addition to bearing the burden of production of a reasonable accommodation, *see Borkowski*, 63 F.3d at 138, Ms. Konspore also must demonstrate that she could perform the essential functions of the job with reasonable accommodation, *see D'Amico*, 132 F.3d at 151. On this point, the most persuasive evidence in the record is from Ms. Konspore's own deposition testimony. She was asked, "Had the option of working from home

been presented to you, would you have been able to inform Mr. Orabona before November 3rd as to whether or not you could return to full-time work?" Def.'s Mot. for Summ. J. [doc. # 48-6] Ex. 4 at 45 (Konspore Dep.). Ms. Konspore responded "No."[6] *Id.* When asked why not, she said, "Because with the Lyme, it's just this ongoing . . . there's ups and downs. The medication doesn't work. You become resistant." *Id.* Based on Ms. Konspore's testimony, no reasonable juror could find that the reasonable accommodation of working from home would have allowed Ms. Konspore to fulfill the essential functions of her position at the time of her termination.

### 3.

Finally, "[a]lthough in some instances, providing medical leave has been held to be a reasonable accommodation required by the ADA, the courts have held that medical leave of indefinite duration is not a required reasonable accommodation." *Cousins v. Howell Corp.*, 113 F. Supp. 2d 262, 271 (D. Conn. 2000) (citing cases).

On November 3, 2009—the date on which she was supposed to return—Ms. Konspore requested that she be allowed until November 20, 2009 to notify FoA whether and when she would be able to return on a full-time basis. FoA had never gone without a full-time accountant for more than a week at a time, notwithstanding Mr. Orabona's alleged statement that the organization had sometimes gone months without financials. As there is no evidence of when Ms. Konspore was able to return to work, and as she was the only accountant in the office, no reasonable juror could find that her request for an apparently unbounded extension of her leave was a request for a reasonable accommodation. *See id.*

---

[6] Immediately afterwards, Ms. Konspore was asked if she would have been able to return to work had she been given the option of returning on a part-time basis. She responded affirmatively.

4.

Ms. Konspore cannot overcome the weaknesses in her case by claiming that FoA failed to engage in an interactive process with her, or that Mr. Orabona failed to consider the possibility of Ms. Konspore returning to work on restricted duty after answering yes to such a question on the disability insurance forms. It is true that "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. New York State Dept. of Labor*, 205 F.3d 562, 566 (2d Cir. 2000); *see also* 29 C.F.R. § 1630.2(o)(3); *Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, 168-69 (E.D.N.Y. 2002) (characterizing this interactive process as "mandatory" based on the legislative history and implementing regulations).

As discussed above, all of Ms. Konspore's proposed accommodations were either not reasonable or would not have allowed her to perform the essential functions of her position at the time of her termination. FoA's alleged failure to engage in an interactive process is therefore irrelevant, as ultimately, "the ADA imposes liability for, *inter alia*, discriminatory refusal to undertake a feasible accommodation, *not mere refusal to explore possible accommodations where, in the end, no accommodation was possible*." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 100 (2d Cir. 2009) (citing 42 U.S.C. §§ 12112(a); 12112(b)(5)(A)) (emphasis added); *see also Farina v. Branford Bd. of Educ.*, No. 10-4347, 2011 WL 5607603, at *3 (2d Cir. Nov. 18, 2011) (noting that a failure to accommodate claim requires a showing by the plaintiff that, "with reasonable accommodation, she could perform the essential functions of the job at issue" (alteration omitted)).

Ms. Konspore offers some evidence—namely, her allegations regarding what was said at layoff meetings and Ms. Feral's alleged comments that she got "latitude" because of her

23

disability—from which a reasonable juror might conclude that FoA unlawfully considered a person's disabilities when making firing decisions. But to reach the question of whether FoA's professed legitimate business reasons for her termination were pretextual, Ms. Konspore must first state a *prima facie* case of discrimination. *See Sista*, 445 F.3d at 169. At the *prima facie* stage, Ms. Konspore bears the burden of demonstrating that she would have been able to perform the essential functions of the job with or without reasonable accommodations. As Ms. Konspore fails to establish this third element of a *prima facie* case, the Court dismisses her ADA and CFEPA claims.

## C.

The Court notes that Ms. Konspore's complaint and subsequent briefing may be read to implicitly include a claim of retaliatory discharge under the ADA, based on her alleged complaints regarding FoA's practices with regard to people with disabilities. To the extent that Ms. Konspore states such a claim, she fails to establish it.

For a claim of retaliation under the ADA, a plaintiff must establish a *prima facie* case, which consists of four elements: "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). Retaliation claims under the ADA are evaluated under the same burden-shifting framework as claims arising under Title VII. *See Lovejoy-Wilson*, 263 F.3d at 223.

The only activity Ms. Konspore alleges that she engaged in that was protected by the ADA were what she terms her internal complaints, made during a March 13, 2009 meeting at which Ms. Feral, Mr. Orabona, Ms. Forthman, and Ms. Konspore were discussing potential

layoffs. At this meeting, according to Ms. Konspore, Ms. Feral cited two employees' health conditions as reasons for selecting them for termination. As she testified in her deposition, Ms. Konspore replied by saying "'You can't say you're letting them go. You need to tell them it's because of lack of work and the economy.'" Def.'s Mot. for Summ. J. [doc. # 48-6] Ex. 4 at 21 (Konspore Dep.); *see also id.* at 33 ("I made it very clear that it was a liability and it was wrong for them to terminate people due to medical or their disabilities or whatever, and that you should be sure it doesn't leave this room, and you say we either are cutting back due to the economy or there's a lack of work."). Ms. Konspore also testified that no one at the meeting—presumably including herself—voiced concern about disability being considered in the context of a layoff meeting.

Even assuming Ms. Feral made discriminatory comments, Ms. Konspore's response hardly constitutes "an activity protected by the ADA." *Sarno*, 183 F.3d at 159. Instead of critiquing Ms. Feral's statements, or even voicing concern about them, Ms. Konspore instead advised Ms. Feral on how to avoid potential ADA liability by falsely substituting another, legitimate business reason for the termination decisions. Nor did Ms. Konspore file an internal or external complaint regarding Ms. Feral's alleged statements. In fact, although Ms. Konspore filed a complaint with the Connecticut Attorney General *the following day*, making numerous complaints about how Ms. Feral was running FoA, she made no mention of Ms. Feral or others at FoA discriminating based on disability.

As Ms. Konspore cannot establish the first element of a *prima facie* ADA retaliation claim, any such claim fails.

# IV.

Ms. Konspore also alleges that her employment was terminated in retaliation for her speech to FoA's officers and executors and to the Attorney General's Office regarding FoA's policies regarding people with disabilities, FoA's misuse of donated funds, and FoA's improper corporate practices. She maintains that her retaliatory termination violated Connecticut General Statutes § 31-51q, which provides in relevant part:

> Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the Unites States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorneys fees as part of the costs of any such action for damages.

*Id.*; *see, e.g.*, *Lowe v. AmeriGas, Inc.*, 52 F. Supp. 2d 349, 359 (D. Conn. 1999). In brief, the statute prohibits the retaliatory discharge of employees who invoke "constitutionally guaranteed free speech rights that, in turn, protect statements that address a matter of public concern." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 776 (1999). Federal First Amendment retaliation law is often employed when evaluating whether retaliation occurred in § 31-51q claims. *See, e.g.*, *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108 (2d Cir. 2004).

## A.

As the Court has dismissed Ms. Konspore's federal claim, it must first determine whether it is appropriate for it to exercise jurisdiction over Ms. Konspore's state law § 31-51q claim. A federal question is sufficiently substantial to support federal jurisdiction if "the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9 (1983). In *Bracey*, 368 F.3d

108, the Second Circuit found that a state-law claim based on Connecticut General Statutes § 31-51q created federal question jurisdiction because it "requires that a court construe federal First Amendment law and evaluate its scope." *Id.* at 116 (quotation marks and alteration omitted).

Unlike the defendant in *Bracey*, FoA is a private entity and therefore not subject to 42 U.S.C. § 1983 liability. However, a private right of action in federal law is not a prerequisite to finding that a state law claim arises under federal law. *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 316-18 (2005). The lack of a federal cause of action is "evidence relevant to, but not dispositive of, the sensitive judgments about congressional intent that [28 U.S.C.] § 1331 requires." *Id.* at 318 (quotation marks omitted). The Second Circuit has construed *Grable* to require a three-part inquiry: "(1) whether the claim necessarily raises a stated federal issue, (2) whether the federal issue is actually disputed and substantial, and (3) whether the court may entertain the claim without disrupting the existing balance of state and federal judicial responsibilities." *W. Hartford Initiative to Save Historic Prop. v. Town of W. Hartford*, No. 3:06-CV-739 (RNC), 2006 WL 2401441, at *4 (D. Conn. Aug. 18, 2006) (citing *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195-96 (2d Cir. 2005)).

All three factors are met here. First, because Connecticut General Statutes § 31-51q incorporates by reference the First Amendment of the U.S. Constitution, it necessarily raises a stated federal issue. *See Ting v. Univ. of Bridgeport*, No. 3:11-cv-20 (CFD), 2011 WL 2222309, at *3 (D. Conn. Jun. 7, 2011). Second, an alleged violation of a person's right to freedom of speech and expression—a constitutional violation—is unquestionably a substantial federal issue. *See id.* Finally, there is no evidence that exercising federal jurisdiction over the state law claim will upset the balance of judicial responsibilities between federal and state courts, especially because alleged First Amendment violations by employers appear to be infrequent and because

federal courts regularly exercise supplemental jurisdiction over state law claims in employment discrimination actions. *See id.* As the *Grable* factors are satisfied, the Court finds that Ms. Konspore's Conn. Gen. Stat. § 31-51q claim raises a federal question is sufficiently substantial to support federal court jurisdiction.

## B.

Turning to the merits of Ms. Konspore's § 31-51q claim, the Court observes that, to establish a *prima facie* case,

> plaintiff must show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action.

*Nyenhuis v. Metro. Dist. Com'n*, No. 3:08CV069 (AWT), 2011 WL 2618965, at *4 (D. Conn. Jul. 1, 2011).

Ms. Konspore's § 31-51q claim is based on three alleged incidents of protected speech—two internal complaints and one formal complaint filed with the Attorney General's office. First, as discussed above, Ms. Konspore states that she questioned Ms. Feral's alleged statements that certain employees should be discharged because of their disabilities. Second, in an April 16, 2009 e-mail, Ms. Konspore criticized certain of FoA's financial decisions, recommended alternatives, and repeatedly noted that she was motivated to write the e-mail because she felt compelled to act in the donors' best interest and that she was extremely worried for the short- and long-term health of the organization. Third, on March 14, 2009, Ms. Konspore sent an e-mail to Connecticut's Attorney General, which states in relevant part:

> Briefly I need help to find a way to save the non-profit I work for in Fairfield Country, CT (I am the controller). The president is running us into the ground – there are only a few months left.

28

They have lost over $2mil in only 10 months of their current fiscal year – and they only have $2.5Mil cash left.

I believe if the BBB or Attorney General were to investigate they would take over immediately. These folks are unethical, self motivating and just careless. They do not adhere to their mission statement. There are 3 board members – the president [and] two other individuals none with real business sense, and none of them are hands on the finances. I have been with them 10 months and knew from day one they had problems, but I was told not to care so much and it will be fine. NOT!!!! One example between the president and her husband they take home over $200k a year with a company car – THIS IS NON-PROFIT? There are many [other] violations in my opinion.

Would you be able to help me or direct me on how to stop this madness[?] If successful I would be more than willing to stick this out in order to keep the mission working, this [I] would be able to do with three or four folks only.

How do I stop them?

Def.'s Mot. for Summ. J. [doc. # 48-10] Ex. 8 (Konspore-AG E-mails).


1.

Ms. Konspore must first establish that she was speaking as a citizen on a matter of public concern, rather than as an employee on a matter of personal interest. *See Nyenhuis*, 2011 WL 2618965, at *4.

As discussed below, the Court concludes that no reasonable jury could find that Ms. Konspore suffered an adverse employment action as a result of her internal statements and e-mail. It therefore does not need to address the question of whether they were made by Ms. Konspore when she was speaking as a citizen on a matter of public concern or as an employee on a matter of personal interest.[7] Accordingly, the Court's analysis of the first element focuses on Ms. Konspore's external complaint.

---

[7] That being said, given the content, form, and context of Ms. Konspore's statements at the lay-off meeting, the Court is highly skeptical that any reasonable juror could construe them as being made as a matter of public concern.

Section 31-51q is not

> limited to freedom of speech in the public arena. Nevertheless, the statute does
> not protect all speech. The statute applies only to expressions regarding public
> concerns that are motivated by an employee's desire to speak out as a citizen. The
> court must consider, therefore, whether [the plaintiff] spoke as a citizen upon
> matters of public concern or instead as an employee upon matters only of personal
> interest. The Connecticut Supreme Court has concluded that it is within the
> province of the trial court to determine, as a matter of law, which topics are
> considered to be of public concern. The resolution of whether an employee's
> statements address such a topic is, however, within the province of the jury, to be
> determined by looking to the content, form and context of the particular
> statements in question.

*Campbell v. Windham Cmty. Mem. Hosp.*, 389 F. Supp. 2d 370, 381-82 (D. Conn. 2005)

(citations and quotation marks omitted); *see also Daley*, 249 Conn. at 782. Speech on a matter of

public concern relates "to any matter of political, social, or other concern to the community."

*Connick v. Myers*, 461 U.S. 138, 146, (1983); *Garcia v. State Univ. of New York Health Sci. Ctr.

of Brooklyn*, 280 F.3d 98, 106 (2d Cir. 2001); *Nyenhuis*, 2011 WL 2618965, at \*4.

"When employees speak out about potentially illegal activities of their employers that

affect third parties or the community at large, courts have held that public concerns are

implicated." *Trusz v. UBS Realty Investors*, No. No. 3:09cv268 (JBA), 2010 WL 1287148, at \*9

(D. Conn. Mar. 30, 2010) (citing cases). Given the content, form, and context of Ms. Konspore's

complaint to the Connecticut Attorney General, a reasonable juror could easily read it as

speaking out about potentially illegal activities and therefore as speech on a public matter

motivated by Ms. Konspore's desire to speak out as a citizen.

Relying on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), Defendants argue that Ms.

Konspore's speech was not protected because she spoke pursuant to her official job duties. *See

id.* at 421. As Connecticut courts are split on the question of whether *Garcetti* applies in § 31-

51q cases,[8] the Court does not reach that issue here. However, the Court does observe that if *Garcetti* were applicable, it would not render Ms. Konspore's speech unprotected. As discussed in more detail below, Ms. Konspore establishes a *prima facie* case of § 31-51q retaliation based largely on her complaint to the Connecticut Attorney General. The Second Circuit has recognized similar complaints, such as those made to elected representatives or independent state agencies, as made via "channels available to citizens generally"—unlike union grievances or internal complaints that occur pursuant to employment agreements or procedures. *Weintraub v. Bd. of Educ. of City of Sch. Dist. of the City of New York*, 593 F.3d 196, 204 (2d Cir. 2010). Therefore, in making a complaint to the Connecticut Attorney General about FoA's alleged mismanagement and abuse of its donations, Ms. Konspore was not acting pursuant to her official job duties, but rather was speaking as a citizen on a matter of public concern.

2.

Ms. Konspore must next establish that she suffered an adverse employment action. *See Nyenhuis*, 2011 WL 2618965, at *4. Generally, "an adverse action in a First Amendment retaliation case is conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011) (quotation marks omitted). "In this context, adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) (alteration and

---

[8] *See Schumann v. Dianon Sys., Inc.*, No. CV055000747S, 2007 WL 2938615, at *4 (Conn. Super. Ct. Sep. 24, 2007) (noting that "a split exists at the [Connecticut] Superior Court level as to whether the holding of *Garcetti* is applicable to speech made by a private employee" (citing cases)); *see also Trusz*, 2010 WL 1287148, at *9 n.8 (explaining why the *Garcetti* logic should not necessarily apply to a § 31-51q case because "[t]he Supreme Court in *Garcetti* did not address any limitations on the exercise of free speech by private employees.").

quotation marks omitted). This list is not exhaustive: "lesser actions may also be considered adverse employment actions." *Id.* (quotation marks omitted). In evaluating lesser actions, the context is crucial. *See Burlington Northern & Santa Fe Rwy. v. White*, 548 U.S. 53, 69 (2006) (discussing the importance of context for evaluating adverse employment actions in the Title VII retaliation context); *Zelnik*, 464 F.3d at 227 ("[The Second Circuit's] standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern*."); *Bracey*, 368 F.3d at 116 (noting that § 31-51q claims are guided by First Amendment law).

Aside from her termination, which both sides agree constitutes an adverse employment action, Ms. Konspore never clearly lays out what additional conduct she considers to have risen to the level of an adverse employment action. Instead, she makes vague references to FoA's "Whistleblowing Retaliatory Conduct," Am. Compl. [doc. # 22] ¶ 73, and FoA's "chipp[ing] away at Plaintiff until it had its opportunity to pounce on her," Pl.'s Resp. [doc. # 54] at 33. Reading the Complaint and briefs generously, however, the Court finds that Ms. Konspore might be referring to three incidents: Ms. Feral's reaction to Ms. Konspore's April 2009 e-mail, Ms. Feral's order that Ms. Konspore not disseminate memos without supervisory review, and Ms. Konspore's allegation that Ms. Feral forbade others from speaking with her.[9]

None of these alleged incidents constitute an adverse employment action, as in this context a reasonable juror could not find that any of them would prevent an individual of ordinary firmness from exercising his or her constitutional rights. *See Cox*, 654 F.3d at 273. Ms. Feral's reaction to the April 2009 e-mail was unquestionably strong—she repeatedly swore at

_____

[9] Ms. Konspore does not argue—and probably could not successfully argue—a "critical mass" claim. *See Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("[A] combination of seemingly minor incidents . . . [can] form the basis of a constitutional retaliation claim once they reach a critical mass.").

Ms. Konspore, asked if she was trying to incriminate someone, ordered her to never put such thoughts in writing, and told her that she would be fired if she ever did something like that again. While Ms. Konspore was roundly and perhaps excessively upbraided, she was not demoted, suspended, her salary and benefits were not reduced, and her work responsibilities were not altered. This single incident, standing alone, is therefore not sufficient to constitute an adverse employment action. *See Alexander v. Westbury Union Free Sch. Dist.*, --- F. Supp. 2d ---, 2011 WL 5401806, at *15 (E.D.N.Y. Nov. 4, 2011) ("[R]eprimands that do not lead to materially adverse employment consequences are not actionable forms of retaliation.") (citing cases); *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("We are extremely mindful that a merely discourteous working environment does not rise to the level of First Amendment retaliation.").

Later, Ms. Feral instructed Mr. Orabona and Ms. Forthman that Ms. Konspore was not to send out any memoranda that they had not first reviewed. However, employers have a right to review and approve employee writings. *See Raia v. Illionois Tool Works, Inc.*, No. 04 Civ. 3535, 2011 WL 3471504, at *11 (E.D.N.Y. Aug. 5, 2011) ("An employer has a right to monitor, and correct when necessary, its employees' shortcomings in performing their jobs.").

Finally, Ms. Konspore testified at her deposition that another employee had told her that Ms. Feral had threatened to fire anyone who spoke with her while she was out on disability. Ms. Konspore offers no evidence, other than her own testimony, in support of this claim. Contradicting Ms. Konspore's testimony is the evidence that Ms. Forthman not only spoke with her while she was on disability, but she was comfortable discussing the contents of the conversation in a later e-mail. No reasonable juror could find, based on these facts, that Ms. Feral had threatened to fire anyone who spoke with Ms. Konspore while she was on leave.

Furthermore, even if Ms. Konspore's allegation were true, the Court does not believe is would consitute an adverse employment action. *See Shaw v. Baldowski*, 192 Misc. 2d 635 (Sup. Ct. Albany Cnty. 2002) (finding that being forbidden from speaking with co-workers was not an adverse employment action). Accordingly, the only relevant adverse employment action was Ms. Konspore's November 3, 2009 termination.

3.

The final element in a *prima facie* retaliation claim under § 31-51q is that the speech was at least a substantial or motivating factor in the adverse employment action. *See Nyenhuis*, 2011 WL 2618965, at *4.

No reasonable juror could conclude that Ms. Konspore's internal statements—either those made at the lay-off meeting or in the April 2009 e-mail—constituted substantial or motivating factors in FoA's decision to terminate her employment. Ms. Konspore's comments at the meeting are more appropriately construed as advice on how to avoid liability, rather than as a complaint of FoA's practices with regard to people with disabilities. Meanwhile, the fact that Ms. Forthman's March 2009 memo apparently raised concerns similar to those discussed in Ms. Konspore's April 2009 e-mail, and yet did not suffer any retaliation, weighs against a finding that Ms. Konspore's termination was motivated by the content of that e-mail. Furthermore, Ms. Konspore's meeting statements were made approximately eight months prior to her termination, and Ms. Konspore's e-mail was sent approximately six and a half months prior to her termination. The time lapse weighs heavily against a finding that either incident resulted in her termination. *See Smith v. Da Ros*, 777 F. Supp. 340, 356 (D. Conn. 2011) ("[D]istrict courts within the Second Circuit consistently have found that lapses of more than two or three months between protected activity and allegedly retaliatory actions do not support inferences of

34

causation."); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation. Six months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation." (citations omitted)).

Whether Ms. Konspore can state a *prima facie* case for retaliation under § 31-51q depends, then, on whether she has adequately established, for the purposes of a motion for summary judgment, that her complaint to the Attorney General was a substantial or motivating factor in her termination.

Although Ms. Konspore maintains that Ms. Forthman knew of her complaint in March 2009, her evidence in support of that claim is hardly conclusive. Ms. Konspore states that once, while Ms. Konspore saw Ms. Forthman on the Attorney General's website, Ms. Konspore said, "Don't worry about it. I already took care of it." Def.'s Mot. for Summ. J. [doc. # 48-6] Ex. 4 at 20 (Konspore Dep.). According to Ms. Konspore, Ms. Forthman allegedly responded that she did not want to know anything else. This is hardly sufficient evidence to allow a reasonable juror to conclude that Ms. Forthman knew that Ms. Konspore had filed a complaint with the Attorney General, much less that Ms. Forthman knew of the content of the complaint or that she subsequently informed Ms. Feral, Mr. Orabona, or others of the complaint.

However, FoA certainly learned of the existence of Ms. Konspore's complaint to the Attorney General via fax on November 3, 2009, shortly before it formally terminated her employment. *See Smith*, 777 F. Supp. at 356 (noting that temporal proximity may support an inference of causation). However, as the relevance of temporal proximity will depend on the other circumstances of the case, "mere temporal proximity between an employee's protected activity and a subsequent adverse employment action will not [alone] support an inference of a

causal connection where the employer had already begun taking adverse employment actions against the employee prior to the employee's engagement in any protected activity." *Id.* at 357. Although there is some question as to whether the temporal proximity is sufficient to establish that Ms. Konspore's complaint was a substantial or motivating factor in her termination, keeping in mind that the plaintiff's burden in establishing a *prima facie* case is *de minimus*, the Court concludes that a reasonable juror might find it to be so. Accordingly, Ms. Konspore states a *prima facie* retaliation claim under § 31-51q. *See Nyenhuis*, 2011 WL 2618965, at *4.

### 4.

Although the Court finds that Ms. Konspore has established a *prima facie* case for § 31-51q purposes, the analysis does not end there. Because FoA raises a legitimate reason for her termination—namely, that she failed to comply with the ultimatum that she return to work by November 3, 2009 or be terminated—Ms. Konspore must demonstrate that this legitimate reason was merely pretext for a firing actually motivated by an interest in retaliation. She fails to do so.

As § 31-51q claims are evaluated under First Amendment retaliation law, FoA raises the *Mt. Healthy* defense: that it can avoid liability by demonstrating, by a preponderance of the evidence, that it would have still terminated Ms. Konspore's employment in the absence of any illegal retaliation.[10] *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-87 (1977) (reasoning that a employee should not be able to avoid termination by engaging in protected conduct, even if that conduct plays a "substantial part" in the employer's decision

---

[10] One of the rationales for this policy is that it "prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct." *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998). However, this rationale is not applicable here; FoA does not allege that Ms. Konspore would avoid deserved punishment, but merely that it would have terminated her employment regardless of her complaints due to her inability to fulfill the essential functions of her position.

regarding the adverse employment action); *see also Hartman v. Moore*, 547 U.S. 250, 250 (2006) (citing *Mt. Healthy* for the proposition that the retaliation must be the but for cause of the discharge to establish causation for employees); *Vince v. Worrell*, No. CV 86-0319386, 1992 WL 172135, at *16 (Conn. Super. Ct. Jul. 14, 1992) (applying *Mt. Healthy* in evaluating a § 31-51q claim and entering judgment in favor of defendants on the basis that the plaintiff would have been fired regardless of her exercise of protected rights). "'The constitutional principle at stake, i.e., freedom from retaliation for protected speech, is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the protected conduct.'" *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011) (quoting *Mt. Healthy*, 429 U.S. at 285-86) (alterations omitted).

FoA argues that, as November 3, 2009 had already been set as the date by which Ms. Konspore was to return to work or provide a date by which she would return to work, her failure to do so was the reason for her termination. Even Ms. Konspore describes this requirement as an "ultimatum." *See* Am. Compl. [doc. # 22] ¶ 41 ("Finally, in or around the end of October 2009, Defendant gave Plaintiff the ultimatum to either return to work full time or lose her job. That decision was to be made by November 3, 2009 . . . ."). Accordingly, FoA reasons, as Ms. Konspore was not placed in a worse position as a result of protected speech—in other words, as her employment would have been terminated regardless, she cannot now bring a § 31-51q claim against FoA for her termination because of information she disclosed in attempting to avoid that termination.

In response, Ms. Konspore states that Ms. Forthman testified in her deposition that, as of the morning of November 3, 2009, to her knowledge FoA had not decided what it would do if Ms. Konspore did not return. Pl.'s Resp. [doc. # 58] Ex. C at 39-40 (Forthman Dep.). However,

Ms. Forthman also testified that she did not participate in all of the discussions regarding Ms. Konspore's termination and that the ultimate decision was Ms. Feral's. *See id.* at 38-39. Testifying at her deposition, Ms. Feral stated that FoA's only reason for terminating Ms. Konspore was that they needed a full-time accountant and Ms. Konspore had not returned to work. *See* Def.'s Mot. for Summ. J. [doc. # 48-3] Ex. 1 at 13-14 (Feral Dep.) ("We gave her a deadline and she didn't comply with it. That was the reason she was terminated. It was my decision."). Ms. Konspore offers no other evidence that FoA's decision to follow through on its "ultimatum" was pretextual.

Ms. Konspore's case is far weaker than that of the unsuccessful plaintiff in *Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir. 2010). Ms. Kaytor received a letter from the defendant, warning her that her employment would be terminated unless she underwent a psychiatric examination. Upon her refusal to schedule an appointment, she was fired. At summary judgment, the only evidence Ms. Kaytor offered to defeat her employer's claim that she was terminated for a legitimate business reason was that, although she had understood the warning, she didn't believe that the defendant would actually follow through with its threat. The district court concluded that Ms. Kaytor presented no evidence from which a reasonable juror could find that the proffered reason was pretextual, and the Second Circuit affirmed its decision on this basis.

Unlike Ms. Kaytor, Ms. Konspore acknowledged that the November 3, 2009 deadline constituted an ultimatum. *See* Am. Compl. [doc. # 22] ¶ 41. Nor does Ms. Konspore claim that she didn't believe FoA would follow through on its ultimatum. Based on these facts, no reasonable juror could find that FoA's business reason for Ms. Konspore's termination was merely pretextual. *See Kaytor*, 609 F.3d at 554.

## VII.

Ms. Konspore's final claim is brought pursuant to Connecticut's Whistleblower Statute, which provides in relevant part:

> No employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action. No municipal employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, to a public body concerning the unethical practices, mismanagement or abuse of authority by such employer. The provisions of this subsection shall not be applicable when the employee knows that such report is false.

Conn. Gen. Stat. § 31-51m. Unlike § 31-51q, resolution of § 31-51m does not "turn on some construction of federal law." *Franchise Tax Bd. of Cal.*, 463 U.S. at 9. Accordingly, the Court declines to exercise supplemental jurisdiction over this state law claim. *Cf. Larkin v. Town of W. Hartford*, 891 F. Supp. 719 (D. Conn. 1995) (declining to exercise pendant jurisdiction over a § 31-51m claim).

## VI.

Because Ms. Konspore fails to establish a *prima facie* case of discrimination based on disability, the Court DISMISSES her ADA and CFEPA claims. Although Ms. Konspore does state a *prima facie* case of retaliation under § 31-51q, as Ms. Konspore does not offer any evidence that FoA's legitimate business reason for her termination was merely pretextual, her § 31-51q claim also fails and is DISMISSED. Finally, the Court declines to exercise supplemental jurisdiction over her § 31-51m claim. Accordingly, FoA's Motion for Summary Judgment [doc. # 48] is GRANTED IN PART and DENIED IN PART. Ms. Konspore may, if

she so desires, raise her § 31-51m claims in state court. **The Clerk is ordered to close the case.**

IT IS SO ORDERED.

/s/    Mark R. Kravitz
           United States District Judge

Dated at New Haven, Connecticut: March 20, 2012.